We'll hear argument next in Mary Ferrell Foundation v. Biden. Good morning, Your Honors. William Simpich, appearing on behalf of Mary Ferrell Foundation, Inc., Josiah Thompson, Gary Aguilar, and we request three minutes be reserved for rebuttal. The way I want to begin is I want to focus my oral argument today on NARA's powers and duties that specifically regarding the remaining provisions under the act addressed in 12b of the JFK Records Act as well as a larger question of the interpretation of the JFK Records Act itself, a remedial statute. And a brief chronology here I think might be helpful. House Select Committee on Assassinations was founded in 1977, and the reason it came together was because of the founders of our country itself were profoundly moved by history and its impact. And they understood that to govern ourselves, Americans must equip ourselves with the power of that knowledge of our history. And they knew unanswered questions remained after the Warren Commission did its work. So it did its work and set aside records when they were done for a period of 50 years to be released only in 2029. And then what happened, because more questions were raised about the JFK case, in the early 90s, the JFK Records Act was passed unanimously by Congress, a legislative feat, if you will, signed by President Bush. And this remedial statute was designed to get these documents out to the public as quickly as possible. And from 1994 to 1998, they did quite a job. And what they had to do, if I may, was they had to identify the records working with the agencies. They had to collect these documents from the agencies. They had to review these documents in consultation with the agencies. And then they had to transmit these documents to NARA, who had custody as the archives. And then finally, the documents would be released, either partially or in full. And many, many documents were released due to the good work of this body by 1998. But there were problems. There were documents that were outstanding. There were statements of compliance that weren't adhered to. And so there was a memorandum of understanding reached by specifically the CIA and NARA. And the board, where there was decisions made to affect this act. And so the question then becomes, how do you address this remedial statute? What benchmark is used? And I think the King v. Well case, Robert's court decided in 2015, is illustrative, especially Judge Scalia's dissent, where he walks through the various ways the statute was addressed liberally by the Roberts court, as they had to do, even with the Affordable Care Act, which was a hot bone of In the case previous to that, the penalty turned into being a tax. These very important decisions were made despite the need to use the literal context of the statute. It also has to be read liberally to affect the purpose, because you don't want to destroy the purpose of the statute itself. Here, there's a good law, the Freedom of Information Act. I'm sure the court's aware of it, and has had to address it in the past. And FOIA is one of those acts where it really opens up a lot of our history to us. But there are a number of exemptions, and these exemptions for national security and other understandable reasons kept getting in the way of these Kennedy records being addressed. And so this act was passed specifically to address the problems in FOIA. So this act, I think we're familiar with the history of how the act came to be, but this act also has an exception. In 5G2D, the president can say that disclosure of certain records would cause harm to defense, intelligence, law enforcement, foreign relations. And here we have a determination by the president, almost in precisely those terms, that says that the remaining records meet that exception. So what do you want us to do with that? Well, there's a couple things. One is, I think 5G2D has to be read liberally, of course, and that means compliance with the sections saying that you've got to be in compliance with the rest of the statute. You can't read the 5G2D in isolation. And Section 6 says the same thing. You've got to be in compliance with the limitations of the statute. You can't just read it in isolation. It should not be a distinct authority. It's our contention. So is it your view that we have this determination by the president that there's harm to defense, intelligence, et cetera. Is it your view that we can say that he's wrong to think that there would be such harm from the release of the records or that his determination is not sufficient to bar the release? It wasn't clear to me from your brief exactly how you wanted us to get to an order that would give you relief. Understood. What we're asking for is, one, we're asking for Section 6 to be read in harmony with Section 5, so specifically the sections, whether it's national security or law enforcement or whatever it may be. It can't be a broad swath. Each document until 2017 was supposed to be addressed with a specific aspect of Section 6 within it, and that's the way it was done until 2017. And we don't think that yardstick changes with the 5G2D additive. The president is free to make a decision about national security or law enforcement. All we're asking is that he or she state what it is. And it's got to comply with 9 and it's got to comply with 6. You can't read 5G2D in isolation. That's our essential argument. And 9D1, the section about the Solon non-delegable authority, it has the same problem. It says within it you've got to comply with Section 6. That doesn't end on 2017. The president still has a duty to comply with Section 6. And 9D2, again, has the same problem. This periodic review process is very, very important. Periodic review under the statute means that the archivist and the agency in question consult together. And they did that until 2017. And now the government's taking the position that this is not necessary anymore. And we're saying it's just as necessary as it ever was. What they're doing now is they're moving the entire decision-making process away from this agency, from the archivist, I should say, in particular, and relegating it to the National Declassification Center, which is an aspect within NARA which works on a daily basis with the intelligence agencies. And the danger, of course, is instead of having the archivist making these recommendations, it's happening with the NDC where the regulators can easily be swayed by the regulated when working with them on a daily basis. The archivist has a special responsibility and the president has a special responsibility to review it after the recommendations come from the archivist. And I should point out that in page 6 of the original order in this case, the court made the decision that we don't have to worry. We should let the president out of this because if there's any problem with these transparency plans, NARA can take the weight. And then in another part of this decision, the judge is saying, well, NARA just made recommendations. But that's the reason the president was let out of the case. These recommendations are in essence the final decision and should be treated as such because NARA has the duty, just like in the Trump cases that have been cited in the past, to step in if the president is going too far and say, we have to fold our arms and not do this because it's not seemingly in most instances to be seeking an injunction against the president. But we can seek an injunction against NARA. And that was the option that the court suggested we take. And that's the option we're taking today. So if we were to agree with you that you have a likelihood of success in the merits, the district court also thought that P.I. was inappropriate because of, among other things, the balance of hardships in the public interest because there's this presidential determination that what you're seeking would harm national security. Why was it an abuse of discretion for the district court to say that? Well, we're not ever going to argue with the president about national security. Doesn't that mean that you lose? Because if we defer to the presidential determination that release would impair national security, that seems like a pretty weighty factor on the public interest and balance of hardships. And that would be, right there, just a basis for denying the injunction, isn't it? Well, if national security is the problem, but right now what we have is a litany, an invocation of four different things. And what we're asking for, at a minimum, is for the president to spell out, like they did for the last 20 years before 2017, not exactly what the problem is, but which category it falls in. Is it national security? Is it law enforcement? Is it something else? These witnesses, for example, are one of the greatest abuses in this situation. These witnesses are reaching the ages of 80, 90, etc. And the public interest doctrine is very clear at section 3 sub 10 here about how weighty the public interest has to be weighed. The transparency plans completely obviate that weightiness. I mean, is it your view that the problem with the presidential determination here is that it didn't? I mean, do you want something like a Vaughn index, like the president has to go through record by record and say what the reason is? That's right, your honor. That's what we're seeking here, that kind of index, because these kind of invocations are simply, they fall against the entire purpose of the act. The purpose of the act is to get these documents out as fast as we can. And if you can't do it now, say what the problem is, and don't take it off the president's desk. Don't take it off the archivist's desk. Don't relegate it to the NDC. 2029 is almost here, and it's a fair bet that these documents are among the most important, not the least important, otherwise they wouldn't be withheld so long. Now, certainly there's going to be national security problems involved, but please keep in mind that this is the reason why there needs to be considered discussion at the NDC. Many of these records that were said to be national security have now been released, and it's generally about foreign relations with Mexico, that kind of thing, where they didn't want people to know about tapes that were being played. Foreign relations with Mexico are important? Of course, everything's important. What I'm saying is, the question is, most of these things are often embarrassing, not national security. And the embarrassment factor is, we would offer the reason why these decisions need to be made at the highest levels of power, not relative. So, where in the statute does it say that the president has to issue a Vaughn Index? It doesn't say that. All right. That's what you're arguing in a preliminary injunction, that that's what you're seeking, right? What we're seeking is, we're seeking the witnesses to be revealed, but we're also seeking other things. We're seeking the outstanding records to be released that have not, that were mentioned in the memorandum of understanding. We're seeking that the statements of compliance be filled out by all the agencies, rather than some of the agencies. We're seeking additional records being released, as well as the records that we've been discussing the last few minutes. And so, what I wanted to end with was, I wanted to focus on NARA's powers and duties. Well, you're down to just over a minute, if you want to reserve. Oh, I'm sorry. I thought I'd reserved three, but I didn't count. So, I'll stop now. Okay. Thank you. Your Honors, and may it please the Court, Jack Starcher on behalf of the United States. The district court here did not abuse its discretion in denying the request for preliminary injunctive relief that are before this Court today. As explained in our briefing, this Court can affirm those denials on any of several independent bases, and I'm happy to answer any questions that the Court has. But otherwise, I ask that you affirm the dismissal. All right. Thank you. Thank you. I kid you about that. All right. Thank you very much. We thank both counsel, and the case is submitted.
judges: THOMAS, MILLER, Molloy